No. 6732.

## CHARLES A. HARRIS VS. ANTOINE DUBUCLET, STATE TREASURER.

The Legislature is empowered to form a contract, to pay an annual rent for buildings necessary for the use of the State; and its power to buy a State-House is equally unquestionable, if the debt thereby created does not exceed the constitutional limitation.

A Legislative act, which, after appropriating a certain sum for a certain legal purpose, payable in annual installments, provides that "out of all State taxes collected, one half of one mill on every dollar shall be set apart of the general funds as a fund to meet" said sum, does not violate the third amendment of the State constitution, devoting the revenues of each year, (except surplus revenues) to the expenses of that year. The effect of such an act is merely to diminish the general-fund tax by the amount it levies for the purpose contemplated in the statute.

APPEAL from the Sixth District Court, parish of Orleans. *Rightor, J.*

*A. L. Tucker, Anatole A. Ker, Breaux, Fenner & Hall,* and *Thomas J. Semmes* for plaintiff and appellee.

*H. N. Ogden,* Attorney General, for defendant and appellant.

The opinion of the court on the original hearing was delivered by EGAN, J., and on the rehearing by MANNING, C. J.

EGAN, J. This is a mandamus suit, brought against the State Treasurer to compel him to pay out of the moneys in the State Treasury, to the credit of "State-House Fund," the nine certain warrants held by plaintiff, and filed with and made part of his petition, amounting to three thousand three hundred dollars, drawn by the Auditor of Public

Accounts on the State Treasurer, and payable out of the State-House fund, appropriated for the purchase of a State House by act number six of the Legislature in 1875, in favor of R. E. Rivers, Treasurer of the New Orleans National Building Association, and by him indorsed. These warrants cover a part of the purchase price of the St. Louis Hotel property. Sec. three of act number six of the General Assembly of 1875, providing for the purchase by the State of the St. Louis Hotel property for a State House, appropriates the sum of $250,000 for the payment of said property.

Section four of the same act provides, " *That out of all the State taxes collected one half of one mill on every dollar shall be set apart of the general funds by the Auditor and Treasurer, as a fund to meet the purchase price of said property;* and the said funds, or so much thereof as shall have been collected, shall be paid to the vendors, at the times to be designated in the act of sale; provided said payments shall be made at least twice in each year."

The answer of the Treasurer avers, " that the contract out of which relator's pretended action arises violates the third constitutional amendment proposed by the third Legislature in article number four of the second session of 1874, and adopted the same year," which reads as follows :   " The revenue of each year, derived from taxation upon real, personal, and mixed property, or from licenses, *shall be devoted solely to the expenses of said year,* for which it shall be raised, *excepting any surplus remain, which shall be directed to sinking the public debt.* All appropriations and claims in excess of revenue *shall be null and void,* and the *State shall in no manner provide for their payment.*"   It would seem that this constitutional amendment fixes at once and beyond the reach of legislative will the destination of the entire revenue derived from all sources of taxation for each successive year, first, *to the payment of the expenses of the year for which* the revenue shall be raised, and, second, if there shall be a surplus, that it shall be devoted to the creation of a *sinking fund to meet the public debt.*   This would seem to provide for the exhaustion for the purposes named of the entire revenue for each year, to *the exclusion of* all other uses and purposes.   But the amendment, after thus fixing absolutely and beyond legislative control the destination of the entire revenue for each year, goes further and provides that, " *all appropriations and claims in excess of revenue shall be null and void, and the State shall in no manner provide for their payment.*"   Thus in one breath the entire revenue is exhausted for the uses and purposes named, and in the next it is provided that all appropriations and claims, in other words, all debts, contracts, or obligations, *in excess of revenue shall be null and void,* and the State is absolutely and positively prohibited from *providing for their payment in any manner.*

Whatever the motives which prompted this amendment to the Constitution, which followed immediately a period of the most profligate expenditure of the public moneys which the State has ever witnessed, its ratification and adoption by the people sufficiently indicates that it was their will and purpose to put a curb upon this condition of things, and upon any disposition on the part of future Legislatures to indulge in their repetition for any purpose whatever other than those named in the amendment itself. This récord does not disclose either the particular years from the revenue of which the four or five thousand dollars. shown to be in the State treasury to the credit of the State-House fund was derived ; manifestly, however, it must have been since 1875, as the act of sale in the record dates the purchase of the St. Louis Hotel for a. State House on the tenth of March, 1875. Neither are we informed by the record of the amount of expenses of each or all of said years, nor whether they equal or exceed the revenues of the year, or leave any surplus after; but as, in any event, we have seen that the entire revenue of each and, consequently, of every year is devoted by the constitutional amendment in question to other uses and objects, there was no room or place for the appropriation of " one half of one mill on every dollar of all State taxes collected " for any or all of the years since, " to meet the purchase price of said property," and such appropriation attempted by article number six of 1875, being in violation of the Constitution, was and is null and void. Such appropriation was neither for the expenses of any year within the language and meaning of the amendment, nor was it the destination of any excess of revenue over such yearly expenses toward the creation of a sinking fund, or to sinking the public debt, within the language or meaning of the amendment, which is set up by the Treasurer as a reason for not paying the warrants held by the relator. The mere fact that there is in the treasury a fund called " the State-House fund," and which has been erroneously reserved or set apart heretofore as such, can not entitle the relator to take that. fund, or any part of it, from the treasury for a purpose prohibited by the amendment to the Constitution.

It is not pretended that any additional or special tax was levied or collected to pay for the State House, but only that a certain part or proportion of all State taxes should be set apart out of " the general funds," and not out of or as a special fund created or collected by law for this specific purpose. This act is also violative of article 111 of the Constitution. It is, however, argued that the State can not retain the property and refuse to pay the price. That may be very true, but that is not the question which we are called upon to determine in the present case. What we are called upon to determine is whether we shall by our order compel the State Treasurer to pay the bonds of the

relator issued for the purchase of the State House out of funds in his hands which are by the Constitution itself devoted to other uses, and which were never collected or received for the payment of the debt incurred in the purchase even if lawfully made.

It is therefore ordered, adjudged, and decreed that the judgment of the court below be avoided and reversed, and that the mandamus sued out by the relator be discharged at his cost in both courts.

## On Rehearing.

Manning, C. J.   It appears from the recitals in the act of sale, that at the time the State became the purchaser of the St. Louis Hotel property, she occupied towards her vendor the position of lessee, under a lease executed 17th April, 1874, by virtue of which, the Building Association had leased to the State the property in question, for a period of nineteen years at an annual rent of $50,000.

The act of sale declares, that this recorded lease which operated as an incumbrance on the property, was extinguished by confusion, the lessee having become absolute owner of the leased premises. It also appears, that at the date of the act of sale, the property in question was leased in part to other persons than the State, and by the purchase she was subrogated to the rights of the lessor as to these lessees. It also appears that the State occupied the property as a State House from April 17, 1874, the date of the lease, until March 10, 1875, the date of the purchase.

The lease for nineteen years was made under authority of the Act of March 16, 1874, which appropriated $38,000 to pay the rent of all public buildings, and authorized the Governor and two other officers to lease in the name of the State "such public building or buildings for the various executive departments, and for the General Assembly, for an annual rental not to exceed $50,000, and for a period not to exceed twenty years," and exempted the buildings from the obligation to pay State and parish taxes while occupied as a State House.

On April 3, 1875 the General Assembly appropriated $7,000 to pay the rent of the State House for the first two months of that year.   The property had been purchased March 10th.

It must be observed that the lease for nineteen years at an annual rental of $50,000, was authorized in March 1874, and was executed on the 17th. of the following month, while the Constitutional amendment was not adopted, and therefore did not become operative, until nearly a year afterward.   The power of the legislature to make an agreement to pay an annual rent for the buildings necessary for the use

of the State can not be doubted. Its power to do so at the time this lease was executed is unquestionable, and its power to buy a State House is equally unquestionable, if the debt thereby created does not exceed the constitutional limitation. There is no pretence that this purchase had that effect.

Our former decision was controlled by the application of the constitutional principle, as embodied in the amendment, that the revenues of each year must be applied to the expenses of the year, and that the State should in no manner provide for the payment of appropriations or claims in excess of that revenue.

The Act of 1875, after appropriating two hundred and fifty thousand dollars for the purchase of the property, enacts that "out of all State taxes collected, one half of one mill on every dollar shall be set apart of the general funds as a fund to meet" this purchase price, and this fund shall be paid to the vendors at the time stipulated in the act of sale, at least twice in each year. Acts, p. 28. The effect of this was to diminish the general-fund tax to $3\frac{1}{2}$ mills, and to levy $\frac{1}{2}$ mill for the State-House purchase. It is not disputed that the Legislature could reduce the general-fund tax to $3\frac{1}{2}$ mills, and levy a tax of $\frac{1}{2}$ mill for the State House, and this is what it did in effect, though not in those words.

Upon a closer examination of the terms of this enactment, we construe it to be, not an appropriation of $250,000 made in that year for an expense of that year, but a designation of that sum for a particular purpose and a dedication of it to a particular use, to be realized and applied through several years at the times specified in the act of purchase. It is not therefore amenable to the objection of being violative of the Constitutional inhibition. Instead of continuing to pay the large rental, stipulated in the lease, the State changed her obligation, with the assent of the other interested parties, into an agreement to pay another and smaller sum in annual instalments, and appropriates such sum as one half of one mill on the dollar will produce in each year for that payment. This is devoting the revenues of each year to the payment of the expenses of the year.

It is therefore ordered and adjudged that our former decree is set aside, and annulled, and that the judgment of the lower court is affirmed with costs.

EGAN, J. I adhere to the views expressed in the original opinion prepared by me as the organ of the court in this case. In my opinion the moment a general-fund tax is levied and collected the destination of every dollar of it is fixed absolutely and beyond legislative control by the third constitutional amendment. The attempt, then, to divert a

Harris vs. Dubuclet.

part of it for the purchase of a State House or any other purpose; however wise or proper in itself, involves a clear infraction of the Constitution, and so can not be considered as making that provision for its payment which the Constitution, article 111, requires when a debt exceeding $100,000 is incurred, because a provision in the teeth of the Constitution is no provision at all. What the Constitution contemplates and requires is a legal and adequate provision.

Again, it is provided in the Constitution that the provision made to meet a debt at the time of its creation shall be irrepealable until it is paid, both principal and interest. Now who can or will for a moment pretend that the general revenue law of the State, *passed some years before* and not when this purchase was made and debt attempted to be incurred—by virtue of which alone the general-fund tax was levied out of which the provision for this purchase was made by the. act of the Legislature authorizing it—possesses that character of irrepealability contemplated by the Constitution! What was to prevent the Legislature from repealing it at any moment, and has it not in fact done so in the exercise of its absolute and unquestioned right? What then becomes of that important feature of the act? It will not do to say that the new revenue law makes equally good provision for the collection of a general-fund tax. That is not the question. Suppose, for instance, the Legislature had repealed the revenue law, *passed and in existence before* this purchase, without enacting any other in its stead, or should to-morrow do the same thing with the act now in existence, *which was passed since* this purchase, how could its right to do so be questioned; and how, under the Constitution, could the relators be heard to complain? If they did so, the answer would be immediate : "The act repealed was not passed when your debt was incurred, nor to make provision for the payment of your debt; and we had and have, at any time, a perfect right to repeal it."

It is, however, argued that because the price of the State House is payable in installments, that each installment is a part of the expenses of the year in which it falls due, and it is therefore competent for the Legislature to appropriate to its payment so much as may be necessary out of the revenues of that year. If this be so, what is to prevent the purchase of a State House, or any other public property, for $2,500,000, instead of $250,000, and the absorption, to meet it, of all the revenues of the State in preference to, and disregard of, all antecedent creditors and debts, provided only the Legislature will resort to the device of making the purchase price payable in installments maturing each successive year until the whole be paid? If this can be done, what is to prevent the State from embarking on a new career of acquisition of public property, the price of which shall absorb every available dollar of its revenue for years to come, and when its creditors, foreign or domestic, make

complaint that their debts remain, and are likely to remain unpaid, by reason of the sinking fund, designed to be created by obedience to the provisions of the third constitutional amendment, being all absorbed by this new device, this new process of the State growing rich in newly acquired property, while its hungry and starved creditors are turned away empty handed, and must be content with being told "This is no debt which we have incurred in making these new purchases the payment of which is preferred to yours. *It is only an expense of each successive year*, legitimately payable out of its revenues even though it absorb them all and leave none for you or the payment of your debt." Does not this exhibit the fallacy of the argument which leads to such conclusions?

The truth is, that it will require only a very cursory review of the legislation of the State, and of the Constitution itself, to show that the terms "*debt*" and "*expenses*" as there used are no more convertible and synonymous than are the same terms when applied to any private person, in regard to whom, or by whom, what is more common than to hear it said, "My expenses are so heavy they leave nothing for the payment of my debts;" or, "My annual expenses are so great that I have nothing left to pay my debts at the end of the year." Look at any Auditor's or Treasurer's report, at any appropriation bill, at any bill to make provision for the conversion or payment of any debt of the State, and the distinction will always appear. The very language of the third amendment to the Constitution itself makes and marks the distinction between *debt* and *expenses*, in that it devotes the revenues of each year in excess of the expenses of that year to sinking the public debt, without distinction also as to what debt, so it be a public debt. Art. 111 of the Constitution, which limits and controls the General Assembly in contracting a debt exceeding $100,000, and the various amendments and provisions of law for the funding, limiting, and reduction of the public debt, all mark the distinction with equal clearness. Indeed, it would seem almost useless to discuss the distinction, were it not that able and ingenious counsel have, in their efforts to sustain the claim of the relators, endeavored to induce the court to disregard it, and to consider the debt incurred in the purchase of the State House as so many items of expense of the years in which the several installments are to be paid by the terms of the contract. It can no more be said that the debt incurred in the purchase is an expense of the years in which the installments fall due, than of any other year in which they may be paid, or of all future time if unpaid.

There are two other considerations, both serious: one affecting the interest of the relator, and the other that of the State, which show the fallacy of the position assumed on behalf of the former. If relator's claim be treated and regarded not as debt but as an expense of the

years in which installments fall due, he would be wholly remediless, and could never be paid, according to the terms and prohibitions of the latter part of the third amendment, in case the revenues of those years fall short of the expenses; while, on the other hand, if the claim be treated as an expense of those years it would be equally entitled to payment out of the revenues of the same with those ordinary expenses necessary to the very existence and operations of the government of the State, the wheels of which might be stopped in order that the relator's debt might be paid in a manner different from any other. The considerations of policy and of interest in the State in the maintenance of the purchase can not control or alter the principles of law applicable to this case.

I adhere to the original opinion in this case, and dissent from the judgment now rendered.